IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

RICHARD CLEVELAND MARTIN,    )
    )
    Petitioner,    )
    )
v.    )    Case No. 3:15-cv-0311
    )
DEBRA JOHNSON, Warden,    )    Judge Trauger
    )
    Respondent.    )

## MEMORANDUM OPINION

Petitioner Richard Martin, a state prisoner incarcerated at the Turney Center Industrial Complex in Only, Tennessee, filed a *pro se* petition under 28 U.S.C. § 2254 for the writ of habeas corpus. (ECF No. 1.) The respondent filed an answer in opposition to the petition (ECF No. 23), along with a copy of the underlying state-court record (ECF No. 21). The petition is ripe for review, and this court has jurisdiction. 28 U.S.C. § 2241(d).

Upon consideration of the petition, the answer, and the underlying state-court record, the court finds for the reasons set forth herein that the petitioner is not entitled to relief on the grounds asserted. The court further finds that an evidentiary hearing is not necessary, *see Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief), and that the appointment of counsel is not warranted. *See* Rule 8(c), Rules Gov'g § 2254 Cases (requiring appointment of counsel to represent indigent petitioner if an evidentiary hearing is necessary). The petition will be denied and this matter dismissed.

## I.    PROCEDURAL BACKGROUND

On February 15, 2007, a Davidson County jury found the petitioner guilty of first-degree premeditated murder and felony murder.[1] The petitioner received a life sentence, with the possibility of parole. (Judgment, ECF No. 21-1, at 31.) The conviction and sentence were affirmed on direct appeal. *State v. Martin* ("*Martin I*"), No. M2007-02097-CCA-R3-CD, 2009 WL 1372287 (Tenn. Ct. Crim. App. May 18, 2009), *perm. app. denied* (Tenn. Oct. 5, 2009). The petitioner filed a *pro se* petition for post-conviction

---

[1] The court merged the felony-murder conviction with the first-degree murder conviction for sentencing purposes. (ECF No. 21-1, at 32.)

relief on October 6, 2010. (ECF No. 21-14, at 33.) The trial court deemed the petition to be timely and appointed an attorney to represent the petitioner in post-conviction proceedings. Appointed counsel filed an amended petition on July 25, 2011. (ECF No. 21-14, at 58.) After conducting a hearing at which the petitioner and his trial and appellate attorneys testified (*see* Hearing Tr., ECF No. 21-15), the trial court entered an order denying the petition. (ECF No. 21-14, at 66.) That decision was affirmed as well. *Martin v. State* ("*Martin II*"), No. M2013-02480-CCA-R3-PC, 2014 WL 6092850 (Tenn. Ct. Crim. App. Nov. 14, 2014), *perm. app. denied* (Tenn. March 11, 2015).

Martin filed his timely § 2254 petition in this court on March 24, 2015.

## II.   STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals summarized the testimony presented during trial as follows:[2]

> This case relates to the death of Angela Richards. At the trial, Jenna Marie Richards, the victim's daughter, testified that she met the defendant at a 2002 Narcotics Anonymous meeting, to which she had accompanied her mother. She said her mother had a substance abuse problem with prescription drugs for as long as she could remember. She stated she met with the defendant five to seven times after that meeting, and she identified him in the courtroom. She said that while she and her brother lived in Florida at the time of trial, her mother had moved to Nashville in September 2004 "to get a fresh start" and to be away from the defendant. She said that her mother and the defendant had been in a relationship and that she and her brother objected to it. She said she and her brother had told their mother that they did not want to have anything to do with her as long as she continued to associate with the defendant. She stated that she spoke on the telephone with her mother at least once or twice weekly, although she said she had not visited her mother in Nashville and did not know where she had been living. She said she only learned the defendant had been in Nashville when she came to Knoxville [sic] after her mother's death and spoke with a detective.
>
> Ilesh Patel testified that he was the manager of the Madison Motel where the victim had been found in the defendant's room on July 14, 2005. He said the defendant, whom he identified in the courtroom, stayed at the motel from May 16 through July 2005. He said that the defendant listed his employer as Labor Finders and his home as Lake Park, Florida. Patel stated that he knew the defendant had a girlfriend who sometimes stayed with him at the motel. He said this girlfriend's first name was Angela. He said that there had been an incident two days before the discovery of the victim's corpse when the defendant and Angela had been arguing. He said the defendant came to the manager's office that afternoon for Patel to tell Angela to leave. Patel said he told her to leave the motel because the room was not registered in her name. He said that was the last time he saw Angela alive. He said he saw the defendant the next afternoon or early evening. He said that the following day, when housekeeping arrived to service the room, his employee had difficulty opening the door. He said the motel's normal practice was to clean the guest rooms every second day. He said that the employee came to his office

---

[2] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1).

and that he went to the defendant's room, where he saw Angela lying on the bathroom floor.

. . . .

William Kirby, an officer with the Metropolitan Nashville Police Department's Identification Crime Scene Section, said he arrived on July 14, 2005, around 12:45 p.m. He said his department documents the crime scene and collects and processes evidence. He explained how fingerprints are discovered and recovered from crime scenes. He said that from the doorway of the hotel room, he saw the victim lying face down at the base of the commode on the bathroom floor and that there was a large "blood spot" on the stripped mattress to his left. He said that the victim's face and hands had been bound with tape, that the victim had a washcloth in her mouth, that her ankles had been bound twice with a belt and another article of clothing, and that the victim had been tied to the commode using a telephone cord. He said items, including the contents of a purse, had been thrown around the room. He said the bloodstains, both wet and dried, on the mattress continued over the edge of the bed onto the floor. He said that a drop of blood was on a pair of shower shoes, that bloodstains were on a rug, and that papers were scattered on the floor. He said he saw two wet, bloodstained shirts in the sink. He said that a roll of tape was on the floor and that it appeared to be the same kind of tape as the tape binding the victim. He said the telephone cord missing from the telephone receiver and base was tied around the victim's hands and around the commode. He said a note on the nightstand read: "I'm sorry I don't know what happened I loved her Call her son, Nick Richards. WPB Fla. My Dad Harold Martin 954 973 4233."

. . . .

Charles Hardy, of the Tennessee Bureau of Investigation's Serology and DNA Analysis Unit, testified that he had known DNA samples from the defendant and the victim with which to compare the physical evidence taken from the hotel room and a sexual assault kit taken from the victim. He said he obtained "a mixture of a DNA profile" from the victim's fingernail scrapings, which meant that he had profiles from two people. In the report of his findings provided as discovery, he identified the victim as the "major contributor" to the genetic profile, and he wrote that the defendant "cannot be excluded as the minor contributor." He testified that in his scientific opinion, the defendant was the minor contributor of the profile developed from the victim's fingernail scrapings. He said that although he "normally would not report out statistical calculations" of the probability that someone other than the defendant would have this DNA profile, the District Attorney requested that he generate statistics for the areas of the DNA mixture in which the defendant's profile had been visible. He stated he developed statistics for these five areas in a subsequent report in which he stated the probability that someone unrelated to the defendant would have this genetic profile was 1 in 786,200 for Caucasians; 1 in 8,842,000 for African-Americans; 1 in 2,124,000 for the southeastern Hispanic population; and 1 in 20,700,000 for the southwestern Hispanic population.

Hardy testified that he found a "small number" of sperm in the victim's vaginal swab. He said that the DNA findings stated in his report were consistent with a mixture of genetic material, that the victim was the major contributor, and that the defendant "cannot be excluded as the minor contributor" of the genetic profile. He testified that in his scientific opinion, the defendant was the minor contributor of genetic material present in the vaginal swab. Regarding his report's other findings, he said the blood on the telephone base, two shirts, shower shoes, and broken beer bottle was the defendant's. He stated that the blood present on the masking tape pieces and roll had either degraded or was of an insufficient amount for DNA analysis. He said that in examining all the items for this case, he did not find DNA from someone other than the victim or the defendant or any unmatched DNA.

On cross-examination, Hardy testified that the DNA profile from each bloody item was the defendant's. He said his scientific opinion had not changed since he wrote his initial report. He said that his "conservative" statement that the defendant "cannot be excluded as the minor contributor of the profile" from both the vaginal swab and fingernail scrapings was consistent with his trial testimony that the defendant was "the minor contributor" of the profiles. He stated that he generated these subsequent statistics for the fingernail scrapings only because the District Attorney had not requested statistics for the vaginal swab material. On redirect-examination, Hardy testified that he and defense counsel did not meet before trial, but that he had met with other defense attorneys in other cases, and that he would have met with defense counsel if asked. On recross-examination, he said that defense counsel did not call to request a meeting between the Thursday evening when he gave the subsequent report to the District Attorney and the Monday morning trial date.

Bruce Phillip Levy, the Chief Medical Examiner for the State of Tennessee and the County Medical Examiner for the Metropolitan Government of Nashville and Davidson County, testified that he certified the results of the autopsy, which another medical examiner performed on July 15, 2005, the day after the victim's body was discovered. He said that the cause of death of the victim was asphyxia and that the manner of death was a homicide. He said that the victim had been pronounced dead at 2:30 p.m.

Dr. Levy testified that the examining medical examiner documented findings about the state of the body before handling or touching the body: the victim's head was wrapped with a combination of tape and pieces of clothing or cloth; her hands were tied and her legs were bound together at the ankles; tape was on her face, including her mouth and nose; a white towel was partially in and protruding from her mouth; and the victim had been tied to the commode in the hotel room. He said that the medical examiner removed the tape, bindings, and washcloth to examine the body and that these pieces were given to the police. He said the victim had to be extricated from the binding to the toilet to be transported to the medical examiner's facility.

Dr. Levy testified about the body's condition after the examiner had removed the tape and bindings. He said that the victim had scrapes and bruises, swelling around her eyes, and ruptured blood vessels in the whites of her eyes. He said that these ruptured blood vessels could have been caused by both trauma and asphyxia and that because the victim had experienced both, he could not determine which caused the victim's ruptured blood vessels. He said the victim had injuries on her face, her left shoulder, the right side of her chest, both arms at the elbows, her legs, and her hands and wrists. He said that sloughing of the skin on her right leg indicated that "some period" had elapsed between her death and the time of the autopsy the day after she had been found. He said the victim had bleeding under the scalp in four specific locations: a large area on the left side, a smaller area on the right side, the forehead, and the back of the head. He said these four injuries were caused by "some type of blunt trauma" to the head, consisting of at least four separate blows. He stated that injuries on the victim's face, particularly around the victim's eyes, were caused by at least three blows other than those that caused the four scalp bleedings. He stated that although there was "no way to tell" from the victim's autopsy if her injuries had caused her to lose consciousness, it "was certainly a possibility."

Dr. Levy testified that because the victim's nose and mouth had been blocked due to the "wrappings around her face and the towel in her mouth," the victim had been unable to breathe. He said that "irreversible brain damage" requires at least four minutes of oxygen deprivation. He stated that the victim was alive at the time she was bound with the cords and clothing because (1) there was no evidence that the victim died from blunt trauma and the victim in fact died from asphyxia; and (2) her wrists, one of the places she had been bound, were bleeding, thereby indicating she had both a heartbeat and blood

pressure. He said that it was difficult to state precisely how long someone had been dead using autopsy observations because there was a "lot of variety from person to person" and certain factors can increase or hinder the development of post-mortem physical signs. He said that using the information gathered in the examination alone, the victim had been dead for twenty-four hours before the autopsy. He said that "historical information," however, provided that the victim was alive "approximately eighteen hours" before the examiner made his findings. He stated that the autopsy findings were consistent with a statement that the victim had been dead at 7 a.m. on July 14, 2005. He said the victim was 5′3″ and weighed 136.5 pounds.

. . . .

Fred W. Hoag testified that he had known the defendant approximately twenty-five years. He said he lived in Fort Lauderdale, Florida, and worked as a drywaller. He said he was with the defendant when the Fort Lauderdale police arrested the defendant in August 2005. He said he and the defendant were in his truck at the defendant's brother's house and that he was going to drive the defendant home. He said the defendant had been working for him for a few weeks.

Hoag testified that when the defendant began working for him, the defendant told him he had been in Tennessee and mentioned Angela, who had been his girlfriend. He said the defendant said he walked into the hotel room and found her dead. He said that he noticed scrapes on the defendant's arms and that the defendant told him he tried to commit suicide after Angela's death. He said the defendant did not tell him how Angela died. After reading his statement to the police, Hoag testified that the defendant told him Angela committed suicide and "died in his arms." He said the defendant also told him that he and Angela "got really bad" on crack cocaine. He said that when the police stopped them at the defendant's brother's house, the defendant had told him not to identify him as "Richard Martin" but instead to call him "Harlan [W]ells." He said that he asked the defendant to explain this and that the defendant told him he had an outstanding warrant for driving on a suspended driver's license. He said the defendant told him the name was his stepfather's. He said he was transported to the police department with the defendant, and he said he gave his statement there.

Ronald Petway testified that the defendant, whom he identified in court, told him that he had killed his girlfriend. He said the defendant claimed he "blacked"; killed his girlfriend, "Angie"; and realized what he had done when he "came back to his senses." Although he said the defendant did not tell him precisely how he had killed his girlfriend, he said the defendant did tell him that she was tied to the toilet and that she had died from strangulation or suffocation. He claimed the defendant told him that he killed his girlfriend because he and she had a "real bad argument" and that he could not bear the arguments any longer. He stated the defendant told him that he had fled because "he had a hold on him" and that he had attempted suicide by cutting his arm. He said the defendant told him no evidence found at the crime scene linked him to the crime. He particularly remembered the defendant saying that his fingerprints were not on the tape found at the crime scene. He said the defendant told him, however, that because he and the girlfriend had intercourse a few days before the victim's death, the defendant was worried any DNA analysis would show that he raped her. He claimed the defendant had revealed he was going to tell the police that his girlfriend's drug dealer killed her over a debt. He said the defendant told him he "was heavily on drugs" and used them a lot. He also said the defendant stated that drug use made him violent. He said the defendant told him that he had kicked his girlfriend through a door the day before the killing. He stated the defendant told him that he had choked his girlfriend at a bowling alley after an argument, too.

On cross-examination, Petway acknowledged felony convictions for possession of a controlled substance with intent to sell, possession of a controlled substance with intent

to resell, conspiracy to distribute and possess with intent to distribute marijuana and cocaine, two convictions for "felonious possession of a weapon," five convictions for possession with intent to distribute substances containing cocaine, and one conviction for attempted distribution and possession with intent to distribute a substance containing cocaine. He also admitted that he had not yet been sentenced for two of the convictions pending his cooperation with law enforcement, promised in a plea agreement. He admitted that if he cooperated, federal officials would recommend a reduced sentence. He stated that his possible sentence ranged from 262 months to 327 months. He also admitted that he had drug cases pending in the trial court. He stated that he had not seen the defendant's discovery documents. On redirect examination, Petway said that when the defendant made all of these statements to him, he told his attorney. He stated that he had not spoken with the prosecution in this case.

Mark Shotwell, a homicide detective for the Fort Lauderdale Police Department, testified that the defendant had an outstanding probation violation for an assault. He said the Nashville police department contacted him regarding the defendant and a homicide in Nashville. He said that he learned the defendant was a suspect in this case and that other members of the Fort Lauderdale department arrested the defendant on August 1, 2005, a few hours after "the initial contact." He said that he and his supervisor, Sergeant Bronson, interviewed the defendant at the station. He said Fred Hoag was also transported to the station.

The videotape of the interrogation was admitted into evidence. It showed Detective Shotwell and Sergeant Bronson interrogating the defendant after reading him his Miranda rights and the defendant asking them, "What's up?" in response to whether he would speak with them. He stated that he had broken a bone in his right hand while he had "blacked out" and that he had stitches on his arm from when he had cut himself. He stated he thought he was there on a probation violation for his conviction for misdemeanor domestic violence assault, with his girlfriend, Angela Richards, as the victim. He said the domestic violence incident consisted of him saying some "rude things" to his girlfriend, whose friend called the police; grabbing the victim; but not touching the victim. He stated he was "blacked out" and had hurt his right hand. He said that his "real name" was Harlan Richard Wells and that he learned the man he thought was his father had not in fact been his biological father.

Initially, the defendant gave the appearance of not knowing that his girlfriend, the victim, was dead. However, the following timeline developed from his responses. He said that on Monday night, his girlfriend wanted him to buy her some crack cocaine but that he refused. He claimed his girlfriend "scratched the hell out of him" on his neck and burned his neck with a cigarette butt. He said his girlfriend told him to leave. He said he went to the landlord [motel manager] to get his help in telling his girlfriend to leave the room. He said that he and the landlord returned to room 149, that his girlfriend said she would stop her conduct, and that he told the landlord he no longer needed his help.

The defendant said he went back to the motel on Tuesday. He said that Phil, the landlord, saw him come back at that time and that Phil said his girlfriend was not there. The defendant said he went to his room and saw his girlfriend was not there. The defendant said he was doing some painting at the motel that day.

The defendant said that on Tuesday night, his girlfriend came to the room with Nip, her crack cocaine dealer. The defendant said his girlfriend had a black eye at that time. He said his girlfriend used crack cocaine, alcohol, and pills. He said that she was "controlling" and that she told him to get out. The defendant said he left. He said he went to a liquor store and to Centennial Park, where he drank tequila and smoked a rock of crack cocaine. He said he woke up Thursday still in Centennial Park. He said he did not go back to the motel room because he was afraid of his girlfriend. Later, he explained that he left the motel and started drinking because his girlfriend was romantically involved

with the drug dealer. He said that after he awakened in the park Thursday morning, he walked to Vanderbilt hospital because he had cut himself. He said he was in the psychiatric ward from Thursday morning until the following Tuesday morning.

After additional questioning, a second story developed. The defendant said he left the motel room Tuesday night. He said that he came back to the room Wednesday morning, that it was still dark, and that he found his girlfriend lying dead on the bathroom floor. He said she had been tied up with tape. He said that her body was cold when he touched her. He denied killing her. He said that in their relationship, he kept leaving his girlfriend—even going back to Florida but then returning to her in Tennessee. He said that he finished drinking his tequila in the motel room, that he took "four tylenol PM's," that he smoked a crack cocaine rock, and that he then tried to commit suicide by cutting himself with a razorblade because of his "loss." He said that he carried the razor blade with him when he left the room, that he walked to hospital, and that he handed the razor blade to hospital security. He said that all the blood in the hotel room was his and that he did not know if the victim had been bleeding. He said the reasons he did not call the police after finding his girlfriend's body were that he was scared, drunk, and had an outstanding probation violation warrant. He also said the victim kept holding the probation violation over his head. He said he had already been reinstated one time on probation. He said that not calling the police was a "bad decision" on his part. He tried to remember Nip's phone number for the police. He acknowledged telling Fred, his brother, and a man he met on a bus that his girlfriend had committed suicide and that she had died in his arms. He stated this was the truth of the events.

The defendant said he was being treated at a mental health facility in Florida before he went to Tennessee. He said that he suffered from depression and that he abused drugs. He said that he was off his prescription mental health drugs, which he described as anti-psychotic medication, for ten to twelve days in Tennessee and that the psychiatric ward put him back on this medication three weeks before the interrogation. He said that when he was not taking his medication in Tennessee, he relapsed to abusing drugs and tequila. He said he was depressed because his girlfriend had left him for Nip.

In response to police questioning that he left a note in the hotel room saying he was sorry, the defendant claimed that the note could have different meanings, particularly that he was sorry the relationship was over but that he had to leave because of drug and relationship issues. He denied killing his girlfriend.

The defendant stated that he was an alcoholic and a drug addict. He said he used drugs for twenty-nine years. He said he had attempted suicide at other times in his life before this recent cutting attempt. He said he had been drug-free for two and a half years before relapsing in Tennessee at the same time he ran out of his medication. He denied ever having "blacked out" at other times and having done things during the time he could not remember. However, he claimed to have no recollection from Tuesday night, when he said he left the motel room, to Thursday morning, when he said he woke up in the psychiatric ward. He then stated his girlfriend had been alive when he left her. Although he claimed not to know who cut him or how, he then said he cut himself with the razor blade he gave to the hospital.

The defendant said he and his girlfriend had been together for four years. He said they had been living in Madison, Tennessee, which he said was a Nashville suburb, since December 2004. He said that he left her four times since they had been in Tennessee but that he kept going back to her. He said he left her because she would not stop using drugs. The defendant admitted he and the victim had what he called "physical problems." He said he would grab her. He said he had "had enough" of the drugs and arguments. He said that his girlfriend's personality changed when she was on drugs and that she had "the devil coming out of her" in her words. The defendant said he learned in treatment to walk away from these confrontations but that his girlfriend would slap him. The defendant

kept saying that he loved his girlfriend and that he tried to get them both off drugs. He said, "You don't understand the anguish that woman put me through." He adamantly denied he would physically harm her. He said his domestic violence conviction was a "verbal" dispute, but he then said he had grabbed her. He said he could not kill anyone and that he never harmed his girlfriend, whom he described as a little woman.

. . . .

The defendant and the State stipulated that the medical records of Middle Tennessee Mental Health Institute reflected that "Harlan Wells" was admitted on July 14, 2005, at 10:15 p.m. and was discharged on July 18, 2005, at 2 p.m. This was the defendant's only proof.

*Martin I*, 2009 WL 1372287, at *1–12. Based on this evidence, the jury found the defendant guilty of both first-degree premeditated murder and felony murder. The trial court merged the latter with the former and sentenced the defendant to life in prison.

On appeal, the defendant argued that the evidence was insufficient to support the verdict, that the trial court erred in admitting into evidence testimony regarding two prior violent incidents between the defendant and the victim, and that the trial court erred in denying the defendant's motion for a mistrial or a continuance based on the State's DNA expert's presenting testimony at trial that was qualitatively different from the information in his report. (ECF No. 21-8.) The appellate court rejected these claims and affirmed the conviction.

In post-conviction, the petitioner raised numerous claims based on the allegedly ineffective assistance of trial and appellate counsel. The amended petition filed by counsel expressly incorporated all the claims asserted in the *pro se* petition and included additional claims of ineffective assistance of trial and appellate counsel. In the order denying the motion, the trial court considered only those issues raised in the amended petition and addressed during the evidentiary hearing. (*See* Order, ECF No. 21-14, at 77.) The Tennessee Court of Appeals affirmed the denial of the petition, finding that the petitioner had abandoned any claims related to the effective assistance of appellate counsel, *Martin II*, 2014 WL 6092850, at *4 n.1, and that he had not been deprived of the effective assistance of counsel at trial. *Id.* at *6–9.

## III.    ISSUES PRESENTED FOR REVIEW

The petitioner has now filed a petition for the writ of habeas corpus in federal district court. The court construes the petition as raising the following claims for relief:

(1) that trial counsel was ineffective for failing to ensure that the petitioner had a full

understanding of the trial process, the elements of the crimes in the indictment, and what the prosecution would have to prove in order to convict him;

(2) that trial counsel was ineffective for failing to request a mental-health examination of the petitioner;

(3) that post-conviction counsel was ineffective for failing to employ an expert in order to support his claim that trial counsel was ineffective for failing to obtain a mental-health examination;

(4) that trial counsel was ineffective for failing to interview known witnesses;

(5) that post-conviction counsel was ineffective for failing to call these known witnesses to testify at the post-conviction hearing;

(6) that trial counsel was ineffective for failing to analyze or review the state's DNA expert's supplemental report provided on the eve of trial or to object to it on the basis that it was inaccurate and incriminating;

(7) that post-conviction counsel was ineffective for failing to argue on appeal the ineffective assistance of direct-appeal counsel.

(ECF No. 1, at 5–11.)

## IV. STANDARD OF REVIEW

A federal district court will not entertain a petition for the writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine designed to promote comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.").

Even when a petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254 raises claims that have been properly exhausted in the state courts, this court's review of the state court's resolution of those issues is quite limited. First, this court may "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, a claim asserting only a violation of state law, even if fully exhausted, is not

cognizable in federal habeas corpus. *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Further, under § 2254(d),

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* In other words, a federal court is bound by the state court's adjudication of the petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Further, this court must presume the correctness of state-court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

## V.    DISCUSSION

### A.    Claims of Ineffective Assistance of Trial Counsel

As set forth above, the petitioner asserts four claims of ineffective assistance of trial counsel, based on trial counsel's (1) alleged failure to ensure that the petitioner had a full understanding of the trial process, the elements of the crimes in the indictment, and what the prosecution would have to prove to convict him; (2) failure to request a mental-health examination of the petitioner; (3) failure to view the crime scene or interview known witnesses; and (4) failure to review or analyze the state's DNA expert's supplemental report prior to trial. All of these claims were fully exhausted in the state post-conviction proceedings.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that, in order to successfully claim that a lawyer's assistance was so ineffective as to violate the Sixth Amendment, a defendant must meet two requirements. "First, the defendant must show that counsel's performance was

deficient." *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is *not* whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted).

In addressing the petitioner's claims for ineffective assistance of counsel in this case, the Tennessee Court of Criminal Appeals first articulated and discussed at some length the standard for proving ineffective assistance of counsel, as established by the Supreme Court in *Strickland*. *See Martin II*, 2014 WL 6092850, at *5. Having articulated the appropriate standard, the court then addressed the petitioner's claims and concluded that the petitioner had failed to prove ineffective assistance of counsel. The question before this court is whether the Tennessee court's application of *Strickland* was unreasonable.

### 1. *Failure to Ensure the Petitioner Fully Understood the Trial Process*

The petitioner argues that his attorney failed to ensure that he had a full understanding of the trial process, the elements of the crimes, or what the state would have to prove in order to convict him. He asserts that he was prejudiced by this failure because, if he had been fully informed of the trial process

prior to trial, he would have chosen to testify on his own behalf at trial. (ECF No. 1, at 6.)

The post-conviction court rejected this claim, crediting the trial attorney's testimony regarding the number of contacts with his client during jail visits, visits in court on court dates, letters, and telephone calls, and noting that "'[n]othing in the record shows that trial counsel failed to meet with petitioner or keep him informed of the proceedings." (ECF No. 21-14, at 77.) The appellate court affirmed on the basis that "[t]he record reflects that trial counsel met with petitioner, reviewed discovery, and informed him about the charges against him and the trial process" and that the petitioner had "not specified how trial counsel performed ineffectively or how he was prejudiced by this alleged shortcoming." *Martin II*, 2014 6092850, at *6.

The trial court's determination was primarily premised upon a credibility determination. A trial court's credibility finding can be overturned by a habeas court only when the "evidence on the [issue] raised . . . is too powerful to conclude anything but" that the trial court's finding was unreasonable. *Miller-El v. Dretke*, 545 U.S. 231, 264 (2005). Neither the state court's factual determination nor its application of the *Strickland* standard was unreasonable, and the petitioner is not entitled to relief on the basis of this claim.

### 2. *Failure to Request a Mental-Health Examination*

The petitioner insists that his trial attorney was ineffective for failing to request a mental-health examination. He does not explain how he was prejudiced by this failure other than to assert that his post-conviction counsel should have called an expert to testify at the post-conviction hearing in order to establish prejudice.

The trial court rejected this claim as initially presented based on its factual findings that (1) the petitioner had testified that he understood the roles of the various parties and witnesses and the charges against him, and (2) he had failed to establish prejudice resulting from trial counsel's failure to request a mental-health examination. The appellate court agreed, specifically noting that, "if a petitioner seeks to establish deficient performance based upon trial counsel's failure to employ an expert witness, then it is incumbent upon the petitioner to call a witness at the post-conviction hearing to establish that the witness's testimony would have benefitted the petitioner and that prejudice has resulted." *Martin II*, 2014 WL 6092850, at *7 (quoting *Clark v. State*, No. M2006-01176-CCA-R3-PC, 2007 WL 2295583, at *9

(Tenn. Ct. Crim. App. Aug. 6, 2007)).

Even now, the petitioner does not indicate what information he believes such a mental-health examination would have yielded or how it would have helped him, for purposes of establishing prejudice. In any event, the petitioner has failed to establish that the state courts' determination was "contrary to, or involved an unreasonable application of, clearly established Federal law," or that it "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). He is not entitled to relief on the basis of this claim.

### 3.      *Failure to Interview Known Witnesses*

The petitioner insists that trial counsel was ineffective for failing to interview witnesses whose names the petitioner had supplied to him.[3]

The trial court, in addressing this claim, considered the testimony of trial counsel, who explained that he did not believe the testimony of the witnesses identified by the petitioner would be relevant or helpful, since there were no eye-witnesses to the murder. The court also observed that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of the defense, these witnesses should be presented by the petitioner at the evidentiary hearing." (Order, ECF no. 21-14, at 79 (quoting *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Ct. Crim. App. 1990)).) The failure to call the witnesses meant that the petitioner could not establish that trial counsel could have, through reasonable investigation, located the witnesses and that these witnesses would have testified favorably to the defense. The trial court denied relief on the basis that, because these witnesses did not testify at the post-conviction hearing, the petitioner could not establish that he was prejudiced by his trial counsel's failure to call the witnesses at trial. The appellate court affirmed on the same basis. *Martin II*, 2014 WL 6092850, at *8.

In his petition in this court, the petitioner does not actually contest the state courts' conclusion; rather, he argues that the result in the state court clearly demonstrates that his post-conviction attorney

---

[3] Under the same "ground" for relief, the petitioner also asserts a claim based on trial counsel's failure to view the crime scene (ECF No. 1, at 7), but he does not include any facts or argument in support of this claim, even to point out that this claim, though fully exhausted in the state courts, was not addressed by either the trial court or the appellate court. The Tennessee Court of Criminal Appeals, while noting that trial counsel indeed testified that he had not viewed the crime scene, did not expressly consider whether that failure constituted ineffective assistance of counsel. *See Martin II*, 2014 WL 6092850, at *7–8.

was ineffective for failing to present witnesses at the post-conviction hearing to support this claim. This particular claim is addressed below. The petitioner has not established that he is entitled to relief on the basis that his trial counsel failed to interview particular witnesses.

### 4. Failure to Review Expert's Supplemental Report

In support of his claim that his trial attorney was ineffective for failing to review the state's DNA expert's supplemental report prior to trial, the petitioner simply quotes at length the state appellate court's decision addressing the same claim:

> Petitioner maintains that trial counsel did not analyze or review the DNA report that was provided to him just prior to trial and that he was prejudiced by this failure because the State's expert provided inaccurate and incriminating testimony and petitioner could not refute it because of trial counsel's unfamiliarity with the document. Trial counsel received supplemental discovery on the Friday prior to the trial beginning on Monday. He described it as "one page of data." At first glance, trial counsel thought the document was unimportant; it appeared to be an "insignificant" numerical base for forthcoming testimony. However, trial counsel said that his understanding had been "completely wrong." He said that the special agent's testimony at trial differed from the content of his report and that at trial, he gave "a much more definitive statement indicating the presence of [petitioner's] DNA in a couple of the samples that were mentioned."

> Trial counsel explained that he was provided the document by an assistant district attorney who was not involved in petitioner's prosecution. Therefore, no one was available who understood the contents of the document. When he reviewed it later that day, he ascertained that he had no idea what it was. He admitted that he "should have been more vigorous in trying to find out what the columns of data were."

> On cross-examination, trial counsel acknowledged that petitioner and the victim had been in a romantic relationship and that petitioner had admitted that the victim had scratched him. The DNA report had indicated that the DNA under the victim's fingernails contained a combination of the victim's and petitioner's DNA. However, trial counsel attempted to draw a distinction between the original report that read, "'[Petitioner] cannot be excluded as a contributor,'" and, "'[T]he chances [that] someone else was the contributor were one in . . . 786,2000 Caucasian males." Trial counsel viewed that assertion as being "a lot more certain than saying he can't be excluded." As to his preparation for trial, counsel indicated that had the original report been more definitive, he might have been "inspired" to consult with an expert in DNA to challenge the "statistical projections." In his testimony, petitioner simply said that he could not recall whether trial counsel attempted to explain the supplemental discovery to him.

> The post-conviction court noted that this issue had been raised and addressed at trial in a jury-out hearing and on direct appeal. Post-conviction relief is not available to relitigate issues that have been raised and litigated on direct appeal. *Forrest v. State*, 535 S.W.2d 166, 167 (Tenn. 1976). Excerpts from this court's opinion on petitioner's direct appeal are set forth above. It is clear that trial counsel raised the difference between the original DNA report and the expert's testimony at trial in a jury-out hearing on a motion for a mistrial and that disclosure of the supplemental report was not timely. *Richard Martin*, 2009 WL 1372287, at *22–23. The trial court noted that because the jury would hear petitioner's statement wherein he admitted that the victim scratched his neck, his being a "minor contributor to the DNA profile developed from the victim's fingernail scrapings would not be surprising to either party." *Id.* This court agreed that the trial court did not err

in denying petitioner's motion for a mistrial on this basis. *Id.*

(ECF No. 1, at 9–10 (quoting *Martin II*, 2014 WL 6092850, at *8–9).)

Other than quoting at length the opinion of the Tennessee Court of Criminal Appeals rejecting this claim, the petitioner offers no argument as to why that opinion should be set aside by this court. Because the state court's decision was not contrary to and did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d), the petitioner is not entitled to relief on the basis of this claim either.

**B.      Claims of Ineffective Assistance of Post-Conviction Counsel**

The petitioner asserts that his post-conviction counsel was ineffective for (1) failing to have an expert testify at the post-conviction hearing in order to support his claim that trial counsel was ineffective for failing to obtain a mental-health examination; (2) failing to call exculpatory witnesses to testify at the post-conviction hearing, to support the claim that trial counsel was ineffective for failing to interview or call these witnesses to testify; and (3) for abandoning on appeal any claims related to the ineffective assistance of direct-appeal counsel.

The Supreme Court has repeatedly confirmed that there is no constitutional right to counsel in post-conviction proceedings and therefore no constitutional right to the *effective* assistance of post-conviction counsel. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). The petitioner's freestanding claims that his post-conviction counsel was ineffective therefore do not present a cognizable basis for federal habeas relief. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings."); *Wallace v. Sexton*, --- F.3d ----, 2014 WL 2782009, at *11 (6th Cir. June 20, 2014) (*same*, citing *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012)).The Supreme Court recently "qualified" *Coleman* by "recognizing a narrow exception" to that categorical rule, holding that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1315. In *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), the Court extended *Martinez* to apply to cases where a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 1921. *See also Sutton v. Carpenter*, 745

F.3d 787, 792 (6th Cir. 2014) (extending *Martinez* and *Trevino* to Tennessee claimants).

The *Martinez/Trevino* exception is narrow. It requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding" and therefore does not "concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings." *Martinez*, 132 S. Ct. at 1320. The petitioner's claim that his post-conviction counsel was ineffective at the appellate stage for abandoning claims related to the ineffective assistance of direct-appeal counsel clearly is not covered by *Martinez* and therefore is not cognizable on habeas review.

The petitioner's other two claims are based on post-conviction counsel's failure to effectively present claims of ineffective assistance of trial counsel by producing witnesses at the post-conviction evidentiary hearing to support the claims. Technically, the underlying claims of ineffective assistance were not procedurally defaulted, because they were in fact argued at the initial level and in the post-conviction appeal. Consequently, they do not fall within the scope of *Martinez* and *Trevino*, which pertain only to claims of ineffective assistance of trial counsel that are procedurally defaulted as a result of the ineffective assistance of post-conviction counsel. In other words, post-conviction counsel's conduct in presenting the claims but without evidence to support them left her client in a worse position than if she had defaulted the claims altogether. Nonetheless, based on *Coleman* and *Martinez*, the court finds that these claims are not cognizable on habeas review.

Even if the court were able to consider the merits of these claims, *Martinez* requires the petitioner to establish that the underlying ineffective-assistance claims are "substantial." *See Martinez*, 132 S. Ct. at 1318–19 (noting that the prisoner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit"). The petitioner has failed to do so in this case, because he has not clearly set forth the identity of the witnesses he believes should have been called or indicated how their testimony would have made any difference in his case.

In short, because the petitioner's claims of ineffective assistance of post-conviction counsel are not cognizable on federal habeas review, relief is precluded by 28 U.S.C. § 2254(a). Even if the claims were cognizable, the petitioner has failed to establish that he would be entitled to relief.

## VI.    CONCLUSION

For the reasons set forth herein, Richard Martin's petition under § 2254 will be denied and this matter dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Because the petitioner has not made a substantial showing of the denial of a constitutional right, the court will deny a COA.

An appropriate order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge